UNITED STATES DISTRICT COURT, DISTRICT OF RHODE ISLAND

CA 07 259

HAROLD DREW :

v. : No. ____________________
(Rhode Island: W1/03-0316A)

ASHBEL T. WALL :

# **MEMORANDUM IN SUPPORT OF HAROLD DREW'S PETITION FOR A WRIT OF HABEAS CORPUS**

Harold Drew
*Pro se*
P.O. Box 8273
Cranston, RI 02920

# TABLE OF CONTENTS


TRAVEL OF THE CASE ........................................ 1

STATEMENT OF FACTS ........................................ 3

ARGUMENT

I. THE TRIAL JUSTICE COMMITTED REVERSIBLE ERROR BY FAILING TO ADEQUATELY INSTRUCT HAROLD DREW'S JURY THAT ACCIDENT NEGATES THE INTENT ELEMENT OF FIRST DEGREE MURDER ........................................ 11

A. The Trial Justice Committed Reversible Error When He Failed To Give An Instruction On A Material Issue Of Fact In The Case. ........................................ 12

B. A Reasonable Juror Would Not Have Understood That Accident Was A Material Issue Of Fact In The Case.................... 15

II. THE TRIAL JUSTICE IMPERMISSIBLY AND UNCONSTITUTIONALLY PRECLUDED QUINTESSENTIAL CROSS-EXAMINATION OF THE STATE'S PRINCIPAL WITNESS, CAUSING UNFAIR PREJUDICE TO HAROLD DREW IN THE PRESENTATION OF HIS DEFENSE. ........................................ 19

III. THE RHODE ISLAND SUPREME COURT FAILED TO GRANT THE PETITIONER'S CRITICALLY IMPORTANT MOTION TO SUPPLEMENT THE RECORD WHICH DEMONSTRATED THAT THE TRIAL COURT ERRED WHEN, IN RESPONDING TO A JURY QUESTION REGARDING A CRITICAL PORTION OF BOBBIE-JO DUMONT'S TRIAL TESTIMONY, THE TRIAL COURT HAD THE STENOGRAPHER READ BACK ONLY A VERY LIMITED PART OF THE DIRECT EXAMINATION. ........................... 26

IV. THE TRIAL JUSTICE COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE THREE LETTERS THAT WERE EXTREMELY, UNFAIRLY PREJUDICIAL TO THE DEFENSE WHILE THEIR ONLY MARGINAL RELEVANCE WAS DERIVED FROM INVITING THE JURY TO "READ BETWEEN" SELECTED LINES, WHICH LINES WERE HIGHLIGHTED IN COLORED INK BY THE POLICE DETECTIVE AND INTERPRETED BY THE ACCOMPLICE/RECIPIENT DUMONT TO HER OWN ADVANTAGE. ....... 33

V. THE TRIAL JUSTICE COMMITTED REVERSIBLE ERROR BY REFUSING TO GIVE AN ACCOMPLICE INSTRUCTION TO THE JURY. ....... 42

VI. THE TRIAL JUSTICE ERRED IN DENYING MR. DREW'S MOTION TO EXCLUDE HIS PRIOR CONVICTION FOR MANSLAUGHTER, PURSUANT TO RHODE ISLAND RULE OF EVIDENCE 609. ....... 47

CONCLUSION ....... 50

# TRAVEL OF THE CASE

Indictment Number W1/2003-0316A was filed in the Superior Court of Washington County, Rhode Island, on August 7, 2003, charging the petitioner, Harold Drew, with seven offenses: Count 1 – the first degree murder of Harold "Jack" Andrews, in violation of R.I.G.L. § 11-23-1 (Reenactment 2002); Count 2 – using a firearm while committing a crime of violence, to wit, murder, in violation of R.I.G.L. § 11-47-3.2(a) (Reenactment 2002); Count 3 – discharging a firearm while committing a crime of violence, to wit, murder, in violation of R.I.G.L. § 11-47-3.2(b)(3) (Reenactment 2002); Count 4 – breaking and entering the dwelling house of James Walker on April 22, 2003, with the intent to commit larceny, in contravention of R.I.G.L. § 11-8-3 (Reenactment 2003); Count 5 – breaking and entering the dwelling house of James Walker on April 28, 2003, with the intent to commit larceny, in violation of R.I.G.L. § 11-8-3 (Reenactment 2003); Count 6 – breaking and entering the dwelling house of Anthony Horne[1] on May 4, 2003, with the intent to commit larceny, in violation of R.I.G.L. § 11-8-3 (Reenactment 2003); and Count 7 – robbery of a person over sixty years of age, in violation of R.I.G.L. § 11-39-1(a)(3) (Reenactment 2003).

Count 2 was dismissed on October 19, 2004 and Count 7 was dismissed on February 7, 2005, pursuant to R.I. Rule Crim. Pro. 48(a).[2] Counts 4, 5, and 6 also were amended by agreement to breaking and entering under R.I.G.L. § 11-8-2. Trial Transcript ["TR"] V 1255. A jury trial commenced after pre-trial motions were heard and decided by Superior Court Justice Edward C. Clifton on October 19, 2004. The trial continued, with Justice

---

[1] Count 6 of the original indictment erroneously charged a second breaking and entering of the Walker home. The state later filed a Motion to Correct the Indictment, which motion was granted by the court.

[2] At the start of trial, Mr. Drew's motion to sever Count 7 for trial was granted. TR I 16-17. On the day of sentencing on the other charges, a Rule 48(a) dismissal was filed as to Count 7.

Clifton presiding, on October 21-22 and 26-29, 2004, and November 3-5 and 9-10, 2004. On November 10, 2004, the jury returned guilty verdicts on all five counts.

A Motion for a New Trial was entertained and denied on December 1, 2004. On January 7, 2005, Justice Clifton sentenced Mr. Drew as follows: Count 1 – the first degree murder of Harold Andrews, a mandatory life sentence; Count 3 (re-designated Count 2) – discharging a firearm while committing a crime of violence against Harold Andrews, a mandatory life sentence consecutive to Count 1; and Counts 4-6 (re-designated Counts 3-5) – breaking and entering a dwelling house, ten years to serve on each count, to run concurrently with each other as well as with Count 1. A notice of appeal was timely filed on February 18, 2005. The case was docketed with the Clerk of this Honorable Court on April 8, 2005.

Because there was no indication in the transcript of what was read back to the jury upon their request to have certain testimony repeated, Mr. Drew moved on March 24, 2006, to supplement the record with an affidavit in which he set forth his memory of the testimony that was read to the jury in response to their inquiry. The motion averred that the stenographer, the attorneys, and the trial justice had no record of what was read back – though defense counsel objected on incompleteness grounds. The state filed a response requesting that a decision on the appellant's motion be deferred pending submission of Mr. Drew's brief. Per order of April 13, 2006, the Court granted the state's request. Thus, Mr. Drew an issue his brief in reliance on the acceptance of his affidavit. The motion was thereafter denied by the Rhode Island Supreme Court without comment, leaving Mr. Drew without a record on which to advance his issue. (*See* documents attached.)

The Rhode Island Supreme Court denied and dismissed Mr. Drew's appeal on April 18, 2007, in *State v. Drew,* 919 A.2d 397 (R.I. 2007).

## STATEMENT OF FACTS

The decedent in this case, Harold Jackson "Jack" Andrews, met a tragic fate after abandoning life as he had lived it and entering into an extra-marital relationship with the state's star witness, Bobbie-Jo Dumont. Nothing – not a loving family, a happy marriage of over three decades, a good job, or a comfortable rural home – sufficed to save Jack Andrews from his ultimately fatal addiction to Bobbie-Jo Dumont. TR I 62-64, 88. On June 1, 2003, about four or five years after this ordinary "bald, overweight, happy" family man had the misfortune of meeting Dumont in a strip club as she danced to earn her next fix, Jack Andrews' skinny body was found decomposing in a remote hayfield in Exeter, his head blown to bits by a high-powered rifle or high-caliber magnum handgun. TR I 65, 106, 114, 164-66, 168, 224, 279.

The decedent's estranged wife, Connie Andrews, age fifty-three at trial time, was the first witness called by the state. TR I 62-63. A decent and hard-working family man all of his life, her husband "wasn't even the same person" after he met Bobbie-Jo Dumont at a strip club one night. TR I 64, 68, 88. By the time Connie first heard Bobbie-Jo's name in 2001, her once jovial husband had degenerated into a skinny nervous wreck who stayed away for days at a time, missed work, and stole from his own family members. TR I 73, 85, 100. Connie said that Jack had told her that he was "taking care of" Bobbie-Jo and trying to help her. TR I 90, 92. Connie testified that, "He would do anything, anything she asked . . . anything at all," which included buying her drugs, bailing her out of jail, giving her money, driving her around, and helping her to "scam johns." TR I 93, 97-99, 105. Although Jack and Connie Andrews separated in 2002 when Jack lost his job and their home, he continued to often visit Connie and to confide in her. TR I 69, 78. Jack told Connie that Bobbie-Jo had

a violent temper and beat him on a number of occasions; in fact, right before he went missing, he told Connie that he had begun to fear Bobbie-Jo. TR I 79-80, 102-03.

Bobbie-Jo Dumont, age thirty-two at trial time, also attested to Jack Andrews' devotion to her. Her drug abuse since the age of thirteen, she admitted, had led to divorce, prostitution, incarceration, and the loss of her four children. TR III 534, 537. After meeting Bobbie-Jo Dumont in 1998 or 1999 while she was working at Cheaters, Jack immediately started seeing her every day, supporting both her and her serious drug habit: "He bought anything for me, anything I needed; rent, bills, clothes, car, methadone, kids' clothes, food, just everything. He took care of me." TR III 543; *see also* TR III 539, 548. Dumont said that Jack also took her out to eat and to the casinos, treated her children to trips to haunted houses, purchased several cell phones for her, paid for hotel rooms, drove her anywhere she wanted to go, accompanied her to prostitution jobs, funded her costly forty bag a day heroin habit, and even sent her on a Florida vacation. TR III 544, 550-52, 555, 568, 783. Although they were "just friends kind of like," she eventually performed sexual acts in exchange for money. TR III 543-44. While she professed to love Jack, she still had boyfriends and told Jack, "Well, you got to deal with it if you want to be with me." TR III 785.

After Dumont met Harold Drew at SSTAR Detox in North Kingstown in November of 2002 (until the two were terminated from the program because of sexual contact), they became inseparable. TR III 559. Even then, Jack Andrews stood by Dumont, allegedly driving the two of them in his truck each day to various burglary targets, pawn shops, and drug dealers. TR III 574-75, 577, 606, 617, 828. Though Jack sometimes got mad and threatened to leave his passengers to their own devices, Dumont said he never followed through and always came back in a day or two. TR III 623-24.

Likewise uncontroverted on this record are the facts relative to the commission of the crimes charged. Three separate breaking and enterings [hereinafter "B&E's"] in which jewelry, firearms, and other household goods were stolen were committed at the Anthony Horne residence in West Greenwich on May 4, 2003, and at the James Walker home in Richmond on April 22 and 28, 2003 – the latter date being a return trip to procure a heavy gun safe from the basement which was left behind in the first break. *See generally* TR II 292-308, 325-377.

Jack Andrews' murder occurred nine days after the Horne B&E, on May 13, 2003. TR III 651. The Deputy Medical Examiner testified that the bullet entered the back of Andrews' skull 5 ¼ inches below the top of his head, 3 ¼ inches to the left of the mid-line; the exit wound was 2 inches below the top of the skull, 2 ½ inches to the right of the mid-line. TR I 235. The bullet thus moved in an upward trajectory through the skull. TR I 256. The Medical Examiner further testified that the cause of death was skull fractures and brain injuries due to a gunshot wound to the head, and that the manner of death was homicide. TR I 243, 244.

Only a small bullet fragment was found in a mass of brain tissue and debris. TR I 227. From the autopsy itself, the medical examiner was unable to discern the position of Jack Andrews' body when he was shot. TR I 236. However, ballistics expert Robert Hathaway testified that if the decedent had been standing up while shot, the .30/.30 caliber cartridge, which is large with considerable power, could have traveled a distance of just under two miles from the scene. TR V 115-16, 1121, 1138. If the victim was instead bending over with an object in front of him (as Bobbie-Jo Dumont alleged at trial, TR III 631, 632, 637), Hathaway testified that one would expect to find the bullet in or around the

object, or one to two feet underground (which would have been discovered with a metal detector). TR V 1139, 1155. The state police, using a metal detector, located no spent shell casings in the surrounding area. TR I 182, 207.

As defense counsel pointed out in his summation, Bobbie-Jo Dumont, the only one who had a long-term relationship with Jack Andrews as well as a motive to kill him, provided the crucial link between Harold Drew and these crimes – especially the murder. TR V 1292-93. As counsel argued: "Bobbie-Jo Dumont, Bobbie-Jo Pimental, Ashley Clarke, by whatever name she goes by, make no mistake about it, this case is all about her." TR V 1292. In testimony fraught with inconsistencies with her prior statements (*E.g.*, TR III 823; TR IV 849, 855, 857, 867-69, 874-75), and induced by a supremely favorable cooperation agreement with the state (TR III 746-48; APP I – St. Ex. 66),[3] Bobbie-Jo Dumont served as the state's star witness in pointing the finger at Harold Drew.

On the day before Jack Andrews' death, Dumont testified, Jack, as he had sometimes done in the past, started "giving her a hard time" (TR III 621) about the way she took advantage of him and threatened to leave her once and for all:

> He said that, uh, he didn't want to do it, he didn't want to give me and Harold no more rides, that he had had enough, he was afraid he was going to get caught, and I was giving too much attention to Harold, that he felt left out and that he wasn't going to do it, that I had to choose who I wanted. He just didn't want to do it no more. He was tired of it. He was trying to make me just make a choice, to choose him, to be with him all the time.

TR III 620-21. *Accord* TR III 826-27, 829-30; TR IV 849-50. *Compare* TR IV 854-55 (never mentioned anything about this in her police statement). Despite this outburst, Dumont

[3] In exchange for her testimony, Dumont pleaded to one pending count of possession of heroin and two counts of B&E; the state also withdrew a violation notice against her. Dumont received a total sentence of five years suspended and probation. TR III 786; APP I. The agreement was breached on numerous occasions before trial. TR III 749-63, 806-15; APP H.

further testified, Jack dutifully appeared the following day at her request to drive her and Harold to the same spot where they had deposited the gun locker so that they could dispose of the unsold guns from the B&E. TR III 625-26.

Inconsistent with her police statement,[4] Dumont testified that as she and Jack Andrews wiped down the gun locker under Mr. Drew's direction, she happened to look up to see Harold lift the .30/.30 to his shoulder and pull the trigger. TR III 637.[5] Feeling "kind of freaked out," she placed the blanket and the heavy gun cabinet on top of Jack's body. TR III 641; TR IV 880-81. (*Compare* Dumont's Grand Jury testimony that Harold "threw the gun locker over him," TR IV 882-83, which was "not a minor discrepancy," TR V 1308). She claimed that Harold later stated, "It had to happen . . . It just had to happen. This had to stop." TR III 643.

Other than Bobbie-Jo Dumont's accusations against Harold Drew of being her co-conspirator/accomplice in two of the B&E's (as she initially disclaimed participation in the third) as well as the surprise triggerman in Jack Andrews' murder, the only arguable evidentiary connections between Mr. Drew and the commission of these crimes out of the 1425 pages of trial transcript, eighty-six pieces of state's evidence, and twenty-two witnesses for the prosecution, were as follows:

---

4 In her police statement at page 7 (unpaginated, lower court file), Dumont said: "Jack walked over to flip the case over and he was having a hard time so I walked over to help him and I heard a bang and I seen Jack drop." TR IV 867-68. She did <u>not</u> tell the police that she saw Harold point the gun or aim and shoot at Jack. TR IV 874, 878.

5 Defense counsel argued that had Jack Andrews been shot as Dumont testified at trial, according to Robert Hathaway's expert opinion, the spent cartridge would have been found in the vicinity of the body. Given the trio's respective heights of 5'3" (Dumont), 5'8" (the decedent), and 6'2" (Harold Drew) and the upward trajectory of the bullet in Andrews' skull, counsel suggested that Jack Andrews was shot while standing up by a person shorter than he was – Bobbie-Jo Dumont. TR V 1312-13 (summation); TR V 1218 (motion for judgment of acquittal); TR IV 886 (height of parties).

- A video surveillance camera at the Bank of Newport branch at the Shaw's Market on Warwick Avenue in Warwick captured Mr. Drew and Bobbie-Jo Dumont attempting to use an ATM card stolen from the Horne residence a couple of hours after the break-in on May 4, 2003; the transaction failed due to an invalid PIN. TR II 293, 313, 319, 416-18, 421-22, 424, 443, 459.
- Jewelry and other sundry items were seized from a blue Dodge mini-van owned by Mr. Drew's sister, which was parked outside of the home of Mr. Drew's father, Harold Drew, Jr., at 22 Hawthorne Street in Providence; both Mr. Drew and Dumont had been living in that van for a couple of weeks around the time of their arrest. TR IV 1028-29, 1032-33, 1042.
- Mr. Drew's father found a gun and a box of ammunition in the doorless closet of an unlocked apartment that was under construction on the second floor of his house; the senior Mr. Drew testified that when he told his son to get the gun out of the house, Harold replied that he would sell it. TR II 394, 398-401, 404. The police later seized an inoperable, antique, .50 caliber muzzle loader gun (as well as the powder propellants required to fire it) from that location. TR IV 1034-36, 1069, 1075; TR V 1146 (Hathaway: gun cannot be fired). The gun was further identified as one stored in the gun safe that had been taken from the Walkers. TR II 361.
- At some point, Mr. Drew and Bobbie-Jo appeared at the elder Mr. Drew's home driving a red truck (allegedly belonging to Jack Andrews). TR II 406.
- On May 31, 2003 at 6 a.m., a truck later identified as belonging to Jack Andrews (who had already been reported missing) crashed into the Jade Island Chinese

Restaurant on Reservoir Avenue in Providence. TR IV 980-81, 985. Two people who ran from the vehicle were quickly apprehended; although they initially provided false names, they were eventually identified as the defendant and Bobbie-Jo Dumont. TR IV 982, 984, 987.

- A blanket, the gun locker, and other assorted hunting-related items stolen from the Walker residence were found on or near the decedent's body when it was discovered. TR I 112, 114, 147, 156, 163; TR II 330, 334-37, 344, 348, 350.
- A jailhouse informant, William Reis, whose criminal record is even more distinguished than that of the accused, testified that Mr. Drew, whom he had known for some twenty-five years, confessed to killing Jack Andrews, explaining that it was an accident. TR IV 946, 954, 960. Reis claimed that Mr. Drew first decided to place the blame on Donald Porraro and, later, "on the girl," though Reis never mentioned the latter before the Grand Jury. TR IV 956-57, 975. Even though Mr. Drew knew that Reis had turned state's evidence against his own brother, the informant testified, Mr. Drew still trusted him. TR IV 966-67. Reis denied trying to curry favor with the police on a new charge of assaulting a police officer, though he did admit that the state had not charged him (as it could) with being a habitual criminal. TR IV 958, 964, 967.
- Discrete parts of three love letters sent by Harold Drew to Bobbie-Jo Dumont (among others) when both were first incarcerated for these offenses, the state argued, confirmed Dumont's allegations of Mr. Drew's motive for, and complicity in, the murder. *See* Issue II, *infra*.

Other than these facts, all of which equally implicated Bobbie-Jo Dumont, no tangible evidence persuasively linked Harold Drew to any of these offenses – certainly not with the murder. A footprint found near the Walker's driveway after the second break-in matched the decedent's footwear. TR II 482, 485. In addition, it was the decedent, not Mr. Drew, who was identified as selling stolen goods at a pawn shop on Manton Avenue in Olneyville. TR IV 1077.

# ARGUMENT

## I. THE TRIAL JUSTICE COMMITTED REVERSIBLE ERROR BY FAILING TO ADEQUATELY INSTRUCT HAROLD DREW'S JURY THAT ACCIDENT NEGATES THE INTENT ELEMENT OF FIRST DEGREE MURDER.

### Introduction

Mr. Drew argued on appeal that the trial court committed reversible error in failing to instruct the jury on the issue of accident[6], but the Rhode Island Supreme Court disagreed. *State v. Drew,* 919 A.2d at 405. Importantly, however, the *prosecution itself* produced evidence that the shooting of Harold Andrews was nothing more than an unintended tragedy. The Rhode Island Supreme Court has repeatedly stated that "it is almost universally held that where there is evidence in support of any defense offered by an accused … the court should present the issue by an affirmative instruction which fully and fairly declares the law applicable thereto." *State v. Cipriano*, 430 A.2d 1258, 1261-1262 (R.I. 1981); *State v. McGuy,* 841 A.2d 1109, 1112 (R.I. 2003); *State v. Butler*, 268 A.2d 433, 434 (R.I. 1970). Although accident was absolutely a material issue of fact in this case, the Supreme Court failed to follow its own precedent relative to Harold Drew.

---

[6] In *State v. Parkhurst,* 706 A.2d 412, 420 n.3 (1998), the Rhode Island Supreme Court reiterated the definition of the defense of accident:

> For the purposes of clarification we acknowledge that an accidental killing is one resulting from a lawful act carried out by one under a reasonable belief that no harm is possible. A defendant nonetheless may claim that another's death was an accident because it was brought about by unintentional means. In such circumstances a defendant's actions, though not sufficient to constitute the crime of murder or voluntary manslaughter, may well constitute involuntary manslaughter if death is the result of criminal negligence or an unlawful act not amounting to a felony.

### A. <u>**The Trial Justice Committed Reversible Error When He Failed To Give An Instruction On A Material Issue Of Fact In The Case.**</u>

Testimony adduced at trial from the jailhouse informant, William Reis, who was called by the state, indicated that Mr. Drew – a man he had known for over twenty-five years and who was his cellmate at the time – confided in him that the shooting of Jack Andrews was an accident and that he had "made a mistake." TR IV 946, 952-55, 964-66, 978. In light of this testimony, defense counsel requested that the trial justice instruct the jury that accident is inconsistent with intent, a required element of murder:

> Murder is the unlawful and intentional killing of a human being with malice aforethought. There are four essential elements which the state must prove to you beyond a reasonable doubt in order to establish the crime of murder. *** <u>Third</u>, the state must prove that the homicide was intentional. Every crime involves a physical element – the doing of the act – and a mental element – the wrongful or criminal intent. If that intent does not exist, then the act is not a crime. An example would be an accidental death. Accident is the opposite of intent. If a person kills another accidentally, he or she lacks the wrongful intent, which would, if the other elements were present, make the act a murder.

Defendant's Request to Charge ¶ 8. In addition, during the parties' pre-charge discussion with the court, defense counsel specifically requested an accident instruction: "I am not asking you, Your Honor, to include each and every word of my instructions in yours. I'm assuming that you will instruct that homicide is not necessarily a crime, that a death could be caused by accidental means. I think you have to give that instruction." TR V 1241-42. Though the prosecutor did not object to an accident instruction *per se* as being unwarranted, she nonetheless contended that the issue was sufficiently covered by the court's proposed instructions. TR V 1241-42. Instead of heeding defense counsel's reasonable request, the trial justice proceeded to give an instruction consonant with the state's position that made a mere passing reference to accident, only mentioning it once while defining "willfully" as an

act "done voluntarily and intentionally, and not by mistake or accident." TR V 1275. *Accord* "Instructions of Judge Edward C. Clifton," p. 13. At the conclusion of the oral charge, defense counsel immediately and specifically objected to the court's failure to properly instruct on accident:

> [I]n my request, specifically my request number 8, I dealt with accident, specifically the paragraph entitled – that begins with the word "third," that the state must prove that the homicide was intentional. Every crime involves a physical act and mental element of a wrongful or criminal intent. If intent does not exist, then the act is not a crime. An example would be an accidental death. Accident is the opposite of intent. If a person kills accidentally, he or she lacks the intent if other elements were present which would make the act a murder. I don't recall Your Honor dealing with the accident. I believe we've heard some testimony from Mr. Reis that Mr. Drew said it was an accident. So I'd ask Your Honor to instruct the jury additionally on that one point.

TR V 1284-85. Despite counsel's strident objection, Justice Clifton replied that he believed that his instructions adequately covered accident within the definition of first degree murder. TR V 1287.

Section 8-2-38 of the General Laws of Rhode Island requires a trial justice to instruct the jury on the law regarding the issues raised by the evidence in a case, whether criminal or civil in nature. For example, in *State v. Fetzik*, 577 A.2d 990 (R.I. 1990), the Rhode Island Supreme Court held that the defendant, charged with murder, was entitled to an instruction on accident where the defendant testified that the gun he was holding accidentally discharged when his hand struck a refrigerator. Generally, it is well-settled that "a defendant is entitled to a charge that explains and informs the jury of those propositions of law that relate to the material issues of fact that the evidence tends to support." *State v. D'Alo*, 435 A.2d 317, 319 (R.I. 1981). *See also State v. Lynch,* 854 A.2d 1022, 1044 (R.I. 2004); *State v. Durand*, 465 A.2d 762, 765-66 (R.I. 1983). "The rules of law applicable to issues at trial are obligatory upon the trial justice, and they must be given in clear and precise language." *State v.*

*Cipriano*, 430 A.2d at 1262, *citing, Macaruso v. Massart*, 190 A.2d 14 (R.I. 1963). *See also Taylor v. State*, 297 S.E. 2d 755 (Ga. App. 1982) (accident is affirmative defense which, if raised, requires instruction by the trial judge); *Columbus v. Bee*, 425 N.E.2d 409 (Ohio App. 1979) (when evidence warrants it and defendant is charged with intentional homicide, defendant has right to instruction on accident); *State v. Best*, 229 S.E.2d 202 (N.C. App. 1976)(if evidence shows accident, it is not enough for the trial judge to charge that the state must prove intent beyond a reasonable doubt, judge must also clearly explain that accident is the antithesis of intent).

Although the evidence in this case unquestionably warranted a clear, specific instruction on accident, the trial justice refused to provide such an instruction to the jury. The fundamental problem herein is that "accident" was only briefly and incidentally mentioned once, and was otherwise buried in a twenty-six page charge to the jury as part of the definition of "willfully." Consequently, it is very likely that the jurors failed to even notice that accident was mentioned at all, much less comprehend the necessity and the critical implications of their findings on that defense. However slight and tenuous the evidence may be on which a hypothesis is advanced, "the fair trial concept requires that the jury consider it under an appropriate instruction." *State v. Butler*, 268 A.2d 433, 436 (R.I. 1970). In fact, the testimony on accident here was neither "slight and tenuous" nor self-serving, but introduced through the state's own witness.

In *United States v. Lesina*, 833 F.2d 156, 160 (9th Cir. 1987), the United States Court of Appeals for the Ninth Circuit reversed a second degree murder conviction on due process grounds because the trial judge did not give an instruction on killing by accident. When

Lesina was charged with the stabbing death of an acquaintance, he claimed that the killing was an accident and was the result of a struggle. In *Lesina*, the Court of Appeals noted that:

> An accidental killing may be second degree murder, manslaughter, or no crime at all. If the jury had before it an instruction which stated the consequences of a finding that Lesina's actions constituted accident, it might have found him guilty of the lesser offense or acquitted him entirely.

*Id.* In that case, defense counsel requested only that the court clarify the instructions regarding murder and manslaughter, without specifically asking for an instruction on accident. *Id.* at 158. Regardless, the Ninth Circuit held that because accident was a viable defense theory presented at trial, it was reversible error for the trial judge's instructions to omit an accident instruction. *Id.* at 160.

Here, accident was likewise a material issue at trial and defense counsel specifically requested an appropriate instruction. Like the trial judge in *Lesina*, Justice Clifton did not instruct the jury on accident, preferring to rely on instructions dealing only with the definitions of the crimes charged. While it is true that the trial judge in *Lesina* did not mention accident at all within his jury instructions, Justice Clifton's fleeting mention of accident once in his charge was tantamount to not giving an accident instruction at all. This failure constitutes reversible error.

### B. A Reasonable Juror Would Not Have Understood That Accident Was A Material Issue Of Fact In The Case.

The trial justice erred in deciding that his definition of "willfully" adequately covered the defense of accident; the Rhode Island Supreme Court was likewise wrong in upholding that ruling. 919 A.2d 404-05. A trial justice is, of course, free to instruct the jury in his or her own words – but only if the instruction given states the applicable law. *State v. Marini*, 638 A.2d 507, 517 (R.I. 1994). A trial justice's refusal to give a criminal defendant's

requested instruction is erroneous whenever his instructions to the jury fail to adequately address the issue at hand. *State v. Parkhurst*, 706 A.2d 412 (R.I. 1998). The reviewing court examines the instructions in their entirety to ascertain the manner in which a jury composed of ordinarily intelligent laypeople listening to the instructions at the close of the case would have likely understood them as a whole. *State v. Hallenbeck,* 878 A.2d 992, 1008 (R.I. 2005). When examined either in isolation or in context of the whole twenty-six pages of instructions, Justice Clifton's charge defining "willfully" as an act "done voluntarily and intentionally, and not by mistake or accident," TR V 1275, was woefully inadequate to have fairly apprised a jury of ordinary laypersons that accident was a critical issue deserving of their close consideration in this case.

In *State v. Parkhurst*, *supra,* another accidental shooting case, the Rhode Island Court held that a judge's instructions sufficed to adequately cover the accident issue. 706 A.2d at 419-20. Steven Parkhurst was charged with first degree murder for the shooting death of an acquaintance, but claimed that the gun discharged accidentally. Like here, the trial justice's instructions in *Parkhurst* were lengthy; unlike this case, however, the trial justice's accident instructions had far more substance and clarity:

> Now, with regard to all that I have explained and instructed upon with regard to murder in the first and second degree, and with regard to the crime of voluntary manslaughter, I must caution you as follows: If you should find and conclude from all the evidence that the death of Trevor Ramella was not intentional on the part of Steven Parkhurst, but was instead accidental, which means as the result of accidental action by Steven Parkhurst, then such killing by Mr. Parkhurst, is neither murder in the first, or second-degree, nor voluntary manslaughter, and in such event, your verdict with regard to crimes of murder in the first or second degree and voluntary manslaughter must be "not guilty."

*Id.* at 419 (emphasis added). The Rhode Island Supreme Court upheld these instructions because, even though they were not the exact instructions requested by defense counsel, they adequately covered the law and properly focused the jury's attention on the accident issue.

Further, in *State v. Cipriano, supra,* the Rhode Island Court again upheld a judge's instructions dealing with the issue of accidental shooting. 430 A.2d at 1258. In that matter, the defendant claimed that the fatal bullet was fired accidentally during a scuffle immediately following an early morning card game. The trial justice instructed:

> Before that person can be found guilty of murder in this state, the State must prove beyond a reasonable doubt that he intended to kill. For example, if you find from the evidence in this case that the shooting of Mr. Granata was accidental, you can't convict Mr. Cipriano because there's no intent to kill when a person is killed accidentally.

*Id.* at 1262 (emphasis added). The Supreme Court upheld these instructions because it believed that the jurors in the case would have understood not only that they were required to consider the defense of accident, but also that the defense did not bear the burden of proof on the question. Moreover, the Court wrote that the trial court's instruction on accident was "fair, complete and presented to the jury in a manner consistent with the defendant's constitutional rights." *Id.*

In contrasting the instructions that were upheld in *Parkhurst* and *Cipriano* with Justice Clifton's instructions in the present case, the inevitable conclusion is that the accident defense was not adequately charged here. Justice Clifton should have carefully instructed the jury on the accident issue either in his own words, or in those set forth in the defendant's written proffer. If Mr. Drew's jury had before it an instruction which clearly stated the importance and the consequences of finding that Mr. Drew's actions had constituted accident, it may well have acquitted him of Jack Andrew's murder. Accordingly, the Rhode

Island Supreme Court should have declared the trial justice's grievous omission as being fatal to this conviction.

## II. THE TRIAL JUSTICE IMPERMISSIBLY AND UNCONSTITUTIONALLY PRECLUDED QUINTESSENTIAL CROSS-EXAMINATION OF THE STATE'S PRINCIPAL WITNESS, CAUSING UNFAIR PREJUDICE TO HAROLD DREW IN THE PRESENTATION OF HIS DEFENSE.

In his closing argument, defense counsel made clear that Mr. Drew's lone accuser, Bobbie-Jo Dumont, was the one who actually killed her "sugar daddy," Jack Andrews. Dumont, suggested defense counsel, was the only person with a motive to kill Jack Andrews and, moreover, had a history of escalating violence toward the victim. TR V 1297-1302. In fact, the decedent's estranged wife, Connie Andrews, who maintained contact with her pathetically smitten husband of thirty-two years out of sheer pity for the man, testified, without objection, as to Jack Andrews' complaints to her of maltreatment at the hands of Bobbie-Jo Dumont:

Q Your husband told you that Bobbie-Jo had a violent temper, did he not?

A Yes, he did.

Q Okay. And, in fact, he told you that she used to beat on him a number of times, right?

A Yes.

Q Okay. What did he tell you about that, Ma'am?

A That she had a temper and, if she didn't get her own way, she would take it out on him or whoever was there.

Q She would hit him?

A Yes.

Q He never hit her back, would he?

A Yes, he did.

Q He did?

A Yes.

Q Basically, like, it was a tumultuous relationship; they would both argue and hit each other?

A As far as I know, yes.

Q And isn't it true, Mrs. Andrews, that your husband actually told you that towards the end just before he disappeared that he had begun to be afraid of her?

A Yes, he did.

TR I 102-03.

In contrast, Dumont tried to minimize her attacks on Jack Andrews, which she characterized as "little fight[s] with our hands" (TR III 831). She explained that when Jack did not give her enough of his time or money, she threatened to leave him. When she tried to get out of his truck in the middle of the road, he grabbed her to stop her from leaving. Dumont further stated that she, in turn, pushed Jack away or hit him in an effort to free herself from his vehicle. TR III 830-31. Dumont testified, in significant part, as follows:

Q [Y]ou've punched him in the past?

A Trying to get away from him. I hit his arm to get off of me. I just didn't attack him.

Q You had a physical relationship with this man, a violent physical relationship with this man, in which you used to beat on him; isn't that true?

A No, no.

Q You never did that?

A I never beat on him, no.

Q You never beat on him?

A No.

Q You never hit him at all?

A I hit him to get – like hit his arm or pushed on him to get him off of me. I never just hit him.

* * *

Q You never beat on Jack?

A No, never.

TR III 832-33.

Given Dumont's boldfaced denial, defense counsel needed to confront her with Jack Andrews' expression of his increasing fear of Dumont, a fact already established *via* Connie Andrews:

Q Would it surprise you, Ma'am, that Jack's –

MS. VERONI: Objection.

THE COURT: Sustained.

Q If I told you that Jack's wife testified in this case already and said that Jack told her that you used to beat on him and that he was beginning to get afraid of you –

MS. VERONI: Objection.

THE COURT: Sustained.

TR III 833.

After a lengthy colloquy, TR III 833-36; TR IV 839-43, Justice Clifton ruled the intended cross-examination inadmissible as violative of R.I. Rule of Evidence 804(c), as well as improper bolstering of Connie Andrews' testimony:

> THE COURT: In a roundabout way, asking this witness, Miss Dumont, to accept what Connie Andrews has testified about, which would be, in effect, bolstering or commenting upon what Connie Andrews has said or the reverse, denying what Connie Andrews has said, which, again, calls for an improper comment from Ms. Dumont about Connie Andrews.

> * * *
>
> The evidence has already been elicited from Ms. Andrews that Mr. Andrews told her that Ms. Dumont beat on him a number of times. That evidence is before the jury. To permit the defendant to interrogate this witness about what Ms. Andrews testified about at trial, this Court rules, would be an impermissible comment by Miss Dumont, regardless of the answer, as to the credibility of Ms. Andrews and also the comment allegedly made to Ms. Andrews by Mr. Andrews. The Court does not find that this testimony from Mr. Andrews to Mrs. Andrews would be admissible at this stage under 804(c). It was not a statement made to Ms. Dumont by Mr. Andrews.
>
> The Court will sustain the objection and instruct the defendant that he cannot inquire – make further inquiry on this line of questioning.

TR IV 843, 845. Mr. Drew argued on appeal that the trial court's ruling and its underlying rationale were completely off the mark, much to Mr. Drew's detriment. Again, the Rhode Island Supreme Court erroneously disagreed. 919 A.2d 411-12.

First, this evidence was already properly received without objection under R.I. Rule Evidence 804(c), the declaration of a decedent made in good faith. Secondly, and more significantly, there was no bolstering attempt made here; defense counsel certainly was not trying to vouch for the credibility of Connie Andrews, the state's first witness, through Bobbie-Jo Dumont's lying lips. Impermissible bolstering occurs – albeit directly or indirectly – when one witness offers an opinion concerning the credibility or truthfulness of the testimony of another witness. *E.g.*, *State v. Hazard*, 797 A.2d 448 (R.I. 2002). "If one witness's testimony has the same 'substantive import' as if it addressed another witness's credibility, it is inadmissible." *State v. Arroyo*, 844 A.2d 163, 169 (R.I. 2004). In all of the Rhode Island Supreme Court's bolstering cases, the offering party had attempted to impermissibly corroborate or substantiate otherwise shaky evidence in the profferer's favor. *See, e.g.*, *State v. Lassiter*, 836 A.2d 1096, 1106-07 (R.I. 2003) (admission of experienced

police detective's opinion testimony that identifying witness was "not completely honest" when he first told the police that he was unable to identify the shooters erroneously implied that the witness was being honest when he gave the second statement in which he named defendant as one of the gunmen); *State v. Miller*, 679 A.2d 867, 873-74 (R.I. 1996)(detective's testimony concerning her experience with witnesses' general tendency to withhold important elements in their statements was improper endorsement of witness's credibility); *State v. Webber*, 716 A.2d 738 (R.I. 1998)(in a case where arson dog was utilized, expert's testimony that dog was more sensitive than the gas chromatograph was impermissible vouching or bolstering); *State v. Haslam*, 663 A.2d 902 (R.I. 1995)(counselor's testimony that she counseled complaining witness for sexual assault recovery was indirect, yet, improper vouching of complaining witness's credibility); *State v. Tavares*, 590 A.2d 867 (R.I. 1991)(officer's testimony that most victims of crime eventually provide more details than initially revealed was improper attempt to bolster complaining witness' credibility); *State v. Brash*, 512 A.2d 1375, 1378-81 (R.I. 1986)(court erred in admitting hearsay testimony from two law enforcement officers about their conversations with an accomplice/informant to support the informant's dubious credibility); *State v. Nicoletti*, 471 A.2d 613, 617 (R.I. 1984)(police officer who took witnesses' original descriptions of defendant impermissibly characterized their descriptions as "pretty much on the money").

The unfairly aborted line of questioning in this case was nothing like those in Rhode Island's prior bolstering cases. Indeed, what defense counsel was attempting to accomplish was to discredit Bobbie-Jo Dumont's unlikely tale in support of his defense: that Dumont's escalating violence toward Jack Andrews culminated in his murder – perpetrated by *her*, not

by Harold Drew. Even a novice defense attorney would have – and should have – confronted Dumont with the already-admitted statements of violence and fear made by the victim shortly before his demise. As defense counsel argued, it was Bobbie-Jo Dumont, not Harold Drew, who had the motive to kill Jack Andrews, a fact counsel vigorously tried to establish at trial. Thus, this critical part of Mr. Drew's cross-examination of his only accuser – the one with so much to gain from his conviction – should not have been precluded.

The Sixth Amendment to the Constitution of the United States guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Article I, §10 of the Rhode Island Constitution provides the same protection. Included within the right of confrontation is the right to cross-examine one's accusers. *E.g., Davis v. Alaska*, 415 U.S. 308 (1974); *Douglas v. Alabama*, 380 U.S. 415 (1965); *State v. D'Alessio*, 848 A.2d 1118 (R.I. 2004); *State v. Bustamante*, 756 A.2d 758 (R.I. 2000); *State v. Oliveira*, 730 A.2d 20 (R.I. 1999); *State v. Olsen*, 610 A.2d 1099 (R.I. 1992); *State v. Texter*, 594 A.2d 376 (R.I. 1991).

The United States Supreme Court has characterized cross-examination as "one of the safeguards essential to a fair trial," *Alford v. United States*, 282 U.S. 687, 692 (1931); *accord In re Oliver*, 333 U.S. 257 (1948), and it is "the principal means by which the believability of a witness and the truth of his [or her] testimony are tested," *Davis v. Alaska*, 415 U.S. at 316. Discrediting facts are never collateral, and always constitute proper impeachment of a witness. *Davis v. Alaska*; *State v. Oliveira*; *State v. Olsen*, *supra*. *Accord* R.I. Rule of Evidence 611(b), permitting cross-examination as to "matters affecting the credibility of the witness." Questions designed to "explain, contradict, or discredit any testimony given by the

witness" are allowable. *State v. Crowhurst*, 470 A.2d 1138, 1143 (R.I. 1984); *State v. Ragonesi*, 309 A.2d 851 (R.I. 1973).

Cross-examination's "denial or significant diminution calls into question the ultimate 'integrity of the fact-finding process.'" *Chambers v. Mississippi*, 410 U.S. 284 (1972), *quoting*, *Berger v. California*, 393 U.S. 314 (1969). Thus, a defendant must be afforded "not just some cross-examination, but *sufficient* cross-examination as a matter of right." *State v. Parillo*, 480 A.2d 1349, 1359 (R.I. 1984)(emphasis in original). Although the scope of cross-examination is subject to the exercise of a trial justice's sound discretion, discretionary authority to limit cross-examination comes into play only once the requirements of the Sixth Amendment of the United States Constitution and Article I, §10 of the Rhode Island Constitution have been satisfied. *State v. Parker*, 566 A.2d 1294, 1295 (R.I. 1989). This Court has said that "it is the essence of a fair trial that reasonable latitude be given the cross-examiner." *State v. Anthony*, 422 A.2d at 924. *Accord State v. Texter*, *supra*; *State v. Oliveira*, 576 A.2d 111 (R.I. 1990); *State v. Veluzat*, 578 A.2d 93 (R.I. 1990); *State v. Powers*, 566 A.2d 1298 (R.I. 1989). Moreover, the Rhode Island Supreme Court has always been "especially solicitous of cross-examination for bias or motive . . ." *State v. Beaumier*, *supra*, at 1372. *Accord State v. Oliveira*, *State v. Veluzat*, *State v. Freeman*, *supra*.

The proposed line of questioning in this case was a perfectly appropriate subject of inquiry on cross-examination, especially since Dumont was so eager to downplay facts so clearly supportive of Mr. Drew's defense. Bobbie-Jo Dumont – and she alone – is the reason why Harold Drew stands convicted of these heinous crimes. To have so restricted such important, fundamental cross-examination, especially for 100% plainly wrong reasons, not only constitutes an abuse of discretion, but also an error of constitutional magnitude.

**III. THE RHODE ISLAND SUPREME COURT FAILED TO GRANT THE PETITIONER'S CRITICALLY IMPORTANT MOTION TO SUPPLEMENT THE RECORD WHICH DEMONSTRATED THAT THE TRIAL COURT ERRED WHEN, IN RESPONDING TO A JURY QUESTION REGARDING A CRITICAL PORTION OF BOBBIE-JO DUMONT'S TRIAL TESTIMONY, THE TRIAL COURT HAD THE STENOGRAPHER READ BACK ONLY A VERY LIMITED PART OF THE DIRECT EXAMINATION.**

The Rhode Island Supreme Court completely and unfairly aborted the Petitioner's right to raise this issue on appeal by refusing to grant his motion to supplement the record. The stenographer, as was her duty, failed to record testimony that was read back to the jury. (*See* materials relative to Motion to Supplement the Record, attached hereto.) Had that motion been properly granted, this argument, which was fully, conditionally briefed, would have been entertained:

* * * * *

The prosecution's entire case against Harold Drew rose and fell on the testimony of Bobbie-Jo Dumont. Mr. Drew's principal defense was that Dumont was the actual shooter, a theory that was fully consistent with the forensics in the case. During closing argument, defense counsel argued that the shooting could not have happened as Dumont alleged:

> [W]e have entrance and exit wounds, and the entrance wound was in the back below – on the base of the skull, on the base of the skull. The exit wound was at the other side of the head an inch or so from the top of the head. The path was upward if you're in an anatomical position. Now, I asked Bob Hathaway a question, and I got down on my knees as I told him, because this is the way it was described to you, that Harold Jack Andrews was shot while he was on his knees wiping the gun locker that was in front of him, on his knees, and I asked him, if that was the case, the head was bent, wiping, bent over in front of a metal object, would you expect to find the bullet in that metal object, and he said yes. There was a noticeable exit wound that Dr. Swartz testified to and she didn't find a bullet. * * *
>
> Now, if he was shot facing the gun locker with his head bent, wouldn't you expect the bullet to be enlarged in the side of the metal locker? * * * They had metal detectors. They were searching the whole area looking for the bullet. They didn't find it. * * * Bob Hathaway testified what would

> happen if a person was shot standing up and the bullet exited the way it was described by Dr. Swartz. That bullet would have passed through his brain, passed through his skull, and gone off into space somewhere. It could have traveled anywhere from a mile to two miles. If he's not shot bent over because you didn't find a bullet in the locker, I mean, it goes without saying that he was shot when he was standing up because where's the bullet? * * *
>
> Hathaway testified that it was the angle, the shooter would determine the angle of the path of the bullet. Now, we know Jack Andrews was five-foot-eight, maybe a little shorter than me. We know Harold Drew is six-foot-two. He's about six inches taller than Andrews. Now, wouldn't you expect that if Andrews was shot while he's standing upright by a person sighting the .30/.30 that I'm holding in my hand, wouldn't you expect that a person taller than Mr. Andrews would have to necessarily – to shoot him in the back of the head would have to necessarily aim downwards a bit so that the path of the bullet would be going down? Now, what would you think if a person was shorter than five-foot-eight like Bobbie-Jo Dumont who's five-three? Wouldn't it be reasonable to believe that if she shot him holding the gun sighting that same way that I did earlier that she would have to aim up a bit and the path of the bullet would be on an upward motion? I suggest to you, ladies and gentlemen, that's exactly what happened here. She described how she saw Jack shot, and the forensic evidence just doesn't prove it. They didn't give us a bullet. Why wasn't the bullet in the locker? Why didn't they find it somewhere on the ground? The bullet, they didn't find it, because the bullet went – passed through this man's skull and was off somewhere; and if he's shot in that fashion, the only one that could have shot him was Bobbie-Jo.

TR V 1311-14.

During deliberations, the jury, apparently wrestling with defense counsel's theory, submitted a question to the court that the trial justice described as follows:

> Madam Foreperson and members of the jury, the Court has received your request that certain testimony from Miss Dumont be read back to you. Your specific written request was Bobbie-Jo's testimony on direct, cross, and redirect as it relates to position of all individuals, Harold, Jack, Bobbie-Jo, at the time of, it says the shot, but the Court interprets that as the shooting, in relation to the pathway and William Reynolds Road.

TR V 1370. In response, however, Justice Clifton directed the stenographer to read back a very limited portion of Dumont's testimony on *direct* examination only:

> Q With respect to Jack's – your observations of Jack, where was the defendant; can you tell us where he was?

A The back of the truck.

Q And wiping down the locker, were you looking to see what he was doing?

A Where I was wiping down the locker, I was facing the rear of the truck, and as I was wiping, I just happened to look up.

Q Okay. And what did you see or what did you notice at this point, Ms. Dumont?

A I noticed that he was standing with one of the guns in his hand.

Q And what did you see him do with the gun that he had had in his hand?

A He lifted it up to his shoulder and pulled the trigger.

Q Ms. Dumont, had the defendant told you what he was going to do when you arrived on that pathway off William Reynolds Road on that day?

A No.

Q Ms. Dumont, you indicated that Jack was at the position at the locker which was closest to the road; is that correct?

A Excuse me?

Q You indicated that Jack at this time was on the end of the locker which is parallel to the path closest to the road; is that correct?

A Yes.

Q What side of his body was facing towards the defendant at this particular time?

A His back.

Q And you indicated that you saw Harold pull the gun up, the defendant pull the gun up; is that correct?

A Yes.

TR III 637-38. (*See* Affidavit, attached hereto) Although the state was satisfied with the content of the selected testimony, TR V 1368-69, defense counsel was not similarly satisfied:

> It seems as if the question says that they would like Bobbie-Jo's testimony on direct, cross, and redirect as it relates to the position of all individuals, Harold, Jack, Bobbie-Jo, at the time of the shot in relation to the pathway and William Reynolds Road. * * * I have no problems with the portions that your Honor is going to read. I just think that more should be included, and I think the parts that are – that aren't included would actually have to do with all the positions, the positions of all the persons at the time of the shot, which I think is what the jury is looking for. In relation to the pathway and William Reynolds Road I think is an addendum. I think their question is that they want the positions of all the people at the time of the shot, as well as the relation . . . [of] these people to the pathway and William Reynolds Road.

TR V 1367-68.

The trial court clearly erred in restricting the testimony read back to the jury to a very discrete part of the direct examination only. The excerpt the court read back to the jury highlighted the shooting itself and the decedent's supposed position with respect to Mr. Drew. As such, it failed to give a fair and complete picture of where all three individuals were situated with respect to each other and to the path and roadway. Moreover, the re-read omitted all of Dumont's impeachment with her prior inconsistent statements upon cross-examination. Much more of Dumont's testimony was not only relevant, but also critical to the jury's inquiry, for example:

<u>On Direct Examination</u>:

- How the gun locker (purportedly being cleaned by a kneeling Jack Andrews and Dumont at the time of the shooting) was positioned with respect to the path and all three individuals (TR III 633-35)
- The angle of Jack Andrews' head with respect to the locker and where Dumont was situated at the time (TR III 635-36).

On Cross-Examination:

- Dumont's impeachment with her police statement in which she gave a completely different description of the relative position of the parties and what they were doing at the time of the shooting (TR IV 866 l. 20 - 868 l. 25)
- More questioning on that point as well as a fuller description of the gun locker with respect to the road (TR IV 870 l. 17 - 874 l. 9)
- The court's questioning of Dumont about the inconsistency between her police statement and her trial testimony regarding the shooting itself (TR IV 878 l. 10-16).

In a word, the jury received a correct but woefully incomplete answer to a question that remained of pressing interest and concern to them – even after deliberating in the late afternoon on one day and all morning on the next day.

In *State v. Dame*, 488 A.2d 418 (R.I. 1985), the Rhode Island Court reversed the defendant's conviction for first-degree arson because, in response to a jury question regarding the time of the fire, the trial court summarized only the direct testimony of the fire inspector and omitted reference to relevant testimony given by the witness on cross-examination. The time of the fire was a critical issue at Dame's trial. The fire chief testified on direct examination that it was his opinion, based on many factors, that the fire started at approximately 12:15 a.m. On cross-examination, however, the chief conceded that the fire possibly may have started at 12:30 a.m. or later, supporting Dame's claim of innocence. After several hours of deliberations, the jury asked for information about the fire chief's testimony as to the time the fire started. In response, the trial judge did not direct the

stenographer to read back the witness's testimony on this point. Instead, the trial court, using its own notes, summarized the testimony given by the fire inspector *on direct examination.*

The Court held that the trial judge had committed prejudicial, reversible error in failing to include information about crucial cross-examination when responding to the jury's request. First, the Court said, if a trial judge attempts to summarize evidence when responding to a jury question, the summary must be completely accurate and impartial. Second, such summarization must avoid in any way an invasion of the province of the jury to determine the facts of the case. Finally, the Court said, "[t]he trial justice may not summarize only direct testimony if the testimony on cross-examination is also pertinent to the determination of the issue that is the subject of the request." *Id.* at 422-23.

In *State v. Pierce*, 689 A.2d 1030 (R.I. 1997), the Rhode Island Supreme Court reversed one of the defendant's convictions for similar reasons. There, an issue was raised at trial regarding whether the complainant was fourteen years of age or younger at the time one of the alleged counts of child molestation occurred. During deliberations, the jury asked the trial court when the complainant said the sexual penetration occurred. In response, the trial justice had the stenographer read back only certain portions of the complainant's testimony and omitted a rereading of the relevant cross-examination in which the complainant conceded that her memory of dates was "blurred." *Id.* at 1035. Citing *Dame*, the Court held that the omitted cross-examination "went directly to the question of whether intercourse had occurred before [the complainant's] fourteenth birthday." *Id.* Consequently, the trial court should have directed the stenographer to read back all of the complainant's direct and cross-examination concerning the timing of the alleged acts of sexual penetration. The Court in *Pierce* reiterated its admonition in *Dame* that a trial justice's response to a jury question

"must be impartial . . ." and must not invade the jury's province to determine the facts of the case. *Id.*

While the Rhode Island Court affirmed those principles in *State v. Dumas*, 835 A.2d 438 (R.I. 2003), the Court therein held that any error by the trial court in limiting a re-reading only to direct examination was harmless where the cross-examination in no way undermined the direct testimony; moreover, the jury heard other evidence on the same subject from other witnesses. In contrast, in this case, as in *Dame* and *Pierce*, cross-examination put a significant dent in the witness' tidy tale on direct examination. Furthermore, Dumont was obviously the sole eyewitness to the shooting, and the jurors themselves clearly specified that they wished a response based on both attorneys' questioning of Dumont regarding their area of concern.

The trial justice's re-reading of the testimony in answer to the jury's question was so incomplete that it was misleading. After several hours of deliberations, the jury was obviously still wrestling with Bobbie-Jo's trial version of events versus the defense theory as summarized in closing arguments; the trial justice's selected passage confirmed only the former. By failing to adhere to this Court's clear requirements in *Dame* and its progeny, the trial court abused its discretion and denied Harold Drew a fundamentally fair trial. The Rhode Island Supreme Court grievously erred by refusing the Petitioner's Affidavit and thereby precluding review of this very worthy issue.

## IV. THE TRIAL JUSTICE COMMITTED REVERSIBLE ERROR IN ADMITTING INTO EVIDENCE THREE LETTERS THAT WERE EXTREMELY, UNFAIRLY PREJUDICIAL TO THE DEFENSE WHILE THEIR ONLY MARGINAL RELEVANCE WAS DERIVED FROM INVITING THE JURY TO "READ BETWEEN" SELECTED LINES, WHICH LINES WERE HIGHLIGHTED IN COLORED INK BY THE POLICE DETECTIVE AND INTERPRETED BY THE ACCOMPLICE/RECIPIENT DUMONT TO HER OWN ADVANTAGE.

**Facts**

During Mr. Drew's lengthy trial, the biggest brouhaha arose over the admission of three letters which, among others, were sent by Mr. Drew to Bobbie-Jo Dumont while both were incarcerated for these crimes. Though defense counsel's first pre-trial order of business was moving *in limine* to bar the state from introducing these letters, the trial justice deferred consideration of the thorny issue until Dumont took the stand. TR I 2-6. Accordingly, in the midst of Bobbie-Jo Dumont's testimonial marathon, arguments of counsel and a *voir dire* of Dumont regarding the letters were made, and the letters' authentication established. *See generally*, TR II 511-33 (arguments); TR III 680-716 (*voir dire*); TR III 717-27 (further arguments). The prosecutor argued, in a nutshell, that the letters proved Harold Drew's motive and state of mind for killing Jack Andrews: to get even with Jack for hurting Bobbie-Jo by "putting his hands on her" (TR II 518-19); to get rid of Jack since the defendant was extremely jealous of Jack's relationship with Bobbie-Jo (TR II 520); and to try to coordinate a fabricated cover-up for the crimes committed (TR II 521).[7]

---

[7] In fact, the state's argument for admitting the evidence was not supported by the evidence. For example, the evidence established that: Jack Andrews and Bobbie-Jo Dumont had been associated for years before Mr. Drew came on the scene; Harold Drew, not Jack, was clearly Dumont's boyfriend; Bobbie-Jo only regarded Jack Andrews as a friend; Jack Andrews aided both Dumont and Mr. Drew and chauffeured them to their desired destinations; Dumont was often the aggressor in her tumultuous relationship with Jack; Harold Drew had made empty threats in the past but never followed through; and, finally, that, just before his murder, Jack

Defense counsel, in turn, argued that all of the excerpts that the state lifted out of context from the letters were vague and easily mischaracterized. Moreover, there was no credible evidence that either a jealous rage or a desire to protect Bobbie-Jo from an abusive Jack Andrews ever precipitated Jack's murder. TR II 523, 527-28. Counsel summarized:

> All of these portions that the State has drawn your Honor's attention to, they all can be misconstrued. They're all vague references to asking something that the State wants the fact finder here to believe but in which they also can be interpreted in other ways, and because of such, they're not relevant.

TR II 532. The letters were arguably relevant, defense counsel further suggested, only if the jury engaged in an impermissible pyramiding of inferences. TR III 731-32.

The court ruled that the letters were properly authenticated (which Mr. Drew does not contest) and that they were likewise relevant to the state's case without being unduly prejudicial to the defense. TR III 731.

Given that ruling, the state then proceeded to introduce two letters through Dumont, inviting her to offer her own "spin" on certain passages that had been highlighted with a magic marker by the police. Dumont was asked to read the text of the first letter to the jury:

> It says, "Hi Gorgeous. I'm going to mail this soon because I want you to start getting lots of mail. I better start getting some mail from you or I'm going to think that you don't love me and that everything I am was or ever did with you was all bullshit. God only knows how much I love you and what lengths I would go to to prove my love. *Bobbie, you are my wife, my princess, and my little girl and just like always, you know I will get even with anyone who hurts you. I know you know that I'm not talking shit.* All I need is my baby. I can't get you out of my mind. I am so fucking much in love it's incredible. I've got to mail this now because I don't – if I don't, it will take an extra day. Love Always, H."

---

Andrews told Bobbie-Jo Dumont that he wanted to take leave of their felonious trio. TR III 543-44, 555-57, 567, 571-72, 621-25, 735, 784, 829-30; TR IV 914.

TR III 775 (emphasis added; the same words are highlighted in St. Ex. 59, APP D). After the prosecutor directed Dumont's attention to the highlighted text, Dumont indicated that the decedent, Jack Andrews, was the only one who had ever hurt her during her relationship with Harold Drew. TR III 776.

Similarly, Dumont was asked to read a second letter to the jury:

> It says, "Hi Baby, and "I love and miss you so much, gargantuan. I can't stop thinking about you. That's all I do is eat, sleep and drink you. However, yesterday word got back to me that you told Chris or said to say hi to him. That fucking bothered me. In fact, it still does. I confronted him just to see if he would say something stupid, but he didn't. Believe me, he never came closer to a broken jaw. *Bobbie, don't forget I'm a very, very jealous dude and only you know things I would do to keep what's mine mine, and you are mine.* I love you more than life, so just remember, there's no one on this entire earth who will love you or do the things we do together like me. I still can't sleep. I get about three hours a night. I've been exercising, push-ups, just to try and get tired. I wish I was with you so bad. I just need to kiss your beautiful face and feel your arms around me. I'm going to hold you forever. I'll never let my little princess go. I will love you forever and ever and ever. Believe me, you are so special to me and you know daddy will always take care of his little girl. I hope to hear from you soon because I love you, gargantuan, and there's such a big part of me missing without you. However, we will be together sooner than they plan. I promise you that. I'm going to go for now, but always remember you are my heart and soul, my whole fucking world. Love always, H. PS: Don't want to hear about it. Every single one's got a story to tell from the Queen of England to the hounds of hell. Ha, ha. Love, love, love you, gargantuan."

TR III 777-79 (State Ex. 60). Again, over the defense's continuing objection, the prosecutor asked for the witness' interpretation of a discrete portion of the letter:

> Q I want to direct your attention back to the first side of that letter where the top is "Hi Baby" and Monday the 23rd. There's a passage in that letter, "Bobbie, don't forget I'm a very, very jealous dude and only you know what things I would do to keep what's mine mine." Do you see that there?
>
> A Yes.

Q Was there anyone who threatened to take anything away from Harold, what he considered to be his, during the course of your relationship?

A Yes.

Q And who was that?

A Jack.

Q Anyone else threaten to take anything away from him from the Fall of 2002 until the day you were arrested on June 6th, 2003?

A No.

TR III 779.

On cross-examination, the witness admitted that she provided her own interpretation of what the letters meant. TR III 781-82. She also acknowledged exchanging letters with Mr. Drew while both were incarcerated, though denying that she tried to goad him into making any incriminating statements. TR IV 908-09. While she said she told him she had made a statement against him within a couple of days of their apprehension, she also testified, "I didn't want him to know I had said anything." TR IV 908-910.

Curiously, the third letter, State Exhibit 87 (APP D), was allowed into evidence, over defense counsel's objection, without either party questioning Dumont. TR III 731; TR IV 944-45. That third, two-page missive had the following text highlighted: "I need for you to stay out of trouble so in about three [or] four months someone can come see you and talk about a strategy. OK?" It continues: "I love you. I will always love you, nothing will ever change that. I promise." *Id.*

With these letters in evidence, the prosecutor used Mr. Drew's own words as a weapon against him – prejudicially and unfairly so, particularly since Mr. Drew was rendered defenseless by his inability to take the stand and advance his own explanation of the *billets-*

*doux*. (*See* Issue VII). Instead, the prosecutor interpreted vague, selected, out-of-context portions of the love letters in accordance with the state's theory and used those excerpts to lend credence to a breathtakingly unreliable witness who was wholly undeserving of belief. The prosecutor argued, in part:

> The defendant makes bad choices to send letters to Bobbie-Jo Dumont when he doesn't know, because she told you in one of her letters, response letters, she writes back to him and tells him, "I had to tell them everything. I had to tell them everything," but he chooses to write to her. . . . * * * These are not musings from some star-crossed lovers. They're letters about violence, they're letters about threats, and we know the context that they're written in because we know that's done through the testimony of Bobbie-Jo Dumont.

TR V 1349-50. Indeed, the prosecutor was desperate to find any shred of evidence to bolster Bobbie-Jo Dumont's credibility; these letters from a lovelorn prisoner were just elastic enough to fit the bill.

**The Law And Its Application**

As argued at trial and on appeal, the evidence set forth above was both irrelevant and prejudicial, much to Mr. Drew's great detriment. Indeed, the evidence's only conceivable relevance was derived solely from the impermissible speculation it invited. The Rhode Island Supreme Court disagreed. 919 A.2d 406-07.

Rule 401 of the Rhode Island Rules of Evidence defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *State v. Dyer*, 813 A.2d 71 (R.I. 2003); *State v. Botelho*, 753 A.2d 343 (R.I. 2000); *State v. Jackson*, 752 A.2d 5 (R.I. 2000). Relevant evidence, then, is material and probative evidence that "in some degree advances the inquiry." 2 *McCormick On Evidence* § 185 at 279 (J.W. Strong, ed. 5th ed. 1999).

Accordingly, the Rhode Island Supreme Court has held evidence relevant only where it has been probative of some disputed element in the case, *i.e.*, where it has served some useful purpose in the case. *E.g., State v. Grayhurst*, 852 A.2d 491 (R.I. 2004)(contents of an envelope sent by defendant to his ex-wife were relevant to charges of stalking; the envelope, but not its contents, was relevant to a separate charge of violating a no-contact order); *State v. Kennedy*, 814 A.2d 364 (R.I. 2002)(evidence describing the practice of drug dealers holding cocaine in their mouths was relevant to the jury's understanding of the defendant's actions being consistent with those of drug dealers and the charges against him); *State v. Jackson*, 752 A.2d 5 (R.I. 2000)(evidence of defendant's possession of live ammunition was highly relevant to establishing the elements of the crimes charged where defendant was charged with intentionally killing someone and *knowingly* possessing and carrying firearms); *State v. Sabetta*, 680 A.2d 927 (R.I. 1996)(possession of firearms and ammunition admitted to show defendant's identity as a police officer and degree to which that position pervaded the defendant's personal life); *State v. Aponte*, 649 A.2d 219 (R.I. 1994)(stabbing victim's medical records from a follow-up visit to the hospital were probative of the type and nature of wound and the manner of attack; victim's scars, which he showed to the jury, were relevant in that they tended to prove an important element of the state's case – that the defendant stabbed him); *State v. Houde*, 592 A.2d 330 (R.I. 1991)(police officer's testimony that defendant asked him whether any warrants were outstanding for his arrest was relevant to consciousness of guilt in murder case); *State v. Messa*, 542 A.2d 1071 (1988)(evidence that alleged molestation victim's behavior changed while he was a student in the defendant's class was relevant to rebut the defendant's contention that the complainants had colluded in bringing charges); *State v. Woodson*, 551 A.2d 1187 (R.I. 1988)(evidence of defendant-

police officer's and victim-exotic-dancer's drug and alcohol use in rape case was relevant and material in determining nature of relationship between the defendant and victim as well as their credibility as witnesses); *State v. Long*, 448 A.2d 427 (R.I. 1985)(witness' testimony that he was in fear for his life when the defendant placed a gun to his head because he had been shot in Vietnam was not irrelevant since it proved essential element of robbery and explained unique reasons underlying the witness' fears); *State v. Kaner*, 463 A.2d 1348 (R.I. 1983)(evidence that defendant and murder victim had been yelling at each other was relevant to establishing motive or malice in a murder case); *State v. Tavarozzi*, 446 A.2d 1048 (R.I. 1982)(testimony describing physical condition and demeanor of defendant was erroneously excluded at trial for it was relevant to issue of self defense in assault case); *State v. Smith*, 115 R.I. 93, 339 A.2d 736 (1975)(testimony of eyewitness that he recognized blue shirt as one worn by perpetrator was probative of the defendant's identification); *State v. Ryan*, 113 R.I. 343, 321 A.2d 92 (1974)(photograph of victim in manslaughter case was relevant to show the extent of his injuries and to prove *corpus delecti*).

The challenged evidence was simply too vague to be relevant. This case was nothing like *State v. Gordon*, 508 A.2d 1339 (R.I. 1986), for example, where a letter written by the accused was deemed very relevant to prove flight to avoid prosecution; nor was this matter like *State v. Grayhurst*, 852 A.2d 491 (R.I. 2004), where a defendant's cards, letters, and other correspondence directly proved charges of stalking the recipient. Mr. Drew's pen-pal turned principal accuser was not only an addict with such a serious habit that it was miraculous that she was still alive, but she was also a felon to boot. She lived on the streets, was always looking for a fix, had lots of "boyfriends," and used her body to get what she needed. There were no doubt a number of people who may have hurt her or used her or

desired her – not only the poor sap who had played patsy to her – and to her and her boyfriend – for so long. Letter three, the vaguest of them all, urged her to stay out of trouble. Moreover, with their respective criminal records and industrious B&E enterprise, the reference to a "strategy" could have applied to myriad things – perhaps to the murder of Jack Andrews that Bobbie-Jo herself committed.

Moreover, even if one were to assume, *arguendo*, that the challenged evidence was marginally relevant, it still should have been excluded since any minimal probative value it may have possessed was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." R.I. Rule Evid. 403. "Unduly prejudicial evidence . . . is such that it so inflames the passions of the jurors as to prevent their ability to consider the evidence of the case impartially." *State v. Sabetta*, 680 A.2d 927, 935 (R.I. 1996), *quoting, State v. Hightower*, 661 A.2d 948, 962 (R.I. 1995). *See also, e.g.*, *State v. Grayhurst*, 852 A.2d 491 (R.I. 2004); *State v. Rice*, 755 A.2d 137 (R.I. 2000); *State v. Tempest*, 651 A.2d 1198 (R.I. 1995); *State v. Lemon*, 497 A.2d 713 (R.I. 1985); *State v. DiPrete*, 468 A.2d 262 (R.I. 1983); *State v. Kaner*, 463 A.2d 1348 (R.I. 1983); *State v. Martini*, 460 A.2d 936 (R.I. 1983); *State v. Bowden*, 439 A.2d 263 (R.I. 1982); *State v. Burke*, 427 A.2d 1302 (R.I. 1981); *State v. St. Pierre*, 118 R.I. 45, 371 A.2d 1048 (1977). In other words, under Rule 403, relevance does not insure admissibility. Rather, the value of the disputed evidence must be worth its cost. Where the relevance of the evidence is substantially outweighed by the danger of confusing, misleading, or prejudicing the jury, *State v. Botelho*, 753 A.2d 343 (R.I. 2000), or where it invites pure speculation, *State v. Squillante*, 622 A.2d 474 (R.I. 1993), the evidence should be excluded.

While all relevant evidence introduced by the prosecution in a criminal trial is inherently prejudicial, "unfair prejudice" is not merely synonymous with "damaging." 2 *Weinstein's Fed. Evid.* §403.04[1][a] at 403-33 (J.M. McLaughlin, ed. 2d ed. 2002). Instead, the committee notes to Federal Rule of Evidence 403, upon which the Rhode Island rule is based, suggest that "unfair prejudice" denotes "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Zeuli*, 725 F.2d 813, 817 (1st Cir. 1984). In other words, it is evidence which tends to evoke bias against the accused as an individual but has little effect on an issue requiring resolution by the jury.

Such is the nature of the letters in this case. As the defense attorney argued, the challenged evidence, so easily susceptible of mischaracterization, contributed nothing to the relevant inquiry but for its speculative connection to the case as fashioned by the witness and argued by the prosecutor. Moreover, as the defense further suggested, there was simply no way to assail the unfair, undeserved, damaging effect of that evidence. To add insult to injury, the contents of the letters in their entirety, inarguably irrelevant, depicted Mr. Drew as an immature, profane, obsessive, under-educated, violent, and vindictive individual. In truth he may have just been trying to impress a woman attracted by those attributes.

No matter how you slice it, this evidence was so irrelevant and speculation-inducing that it simply had no basis in a criminal trial. *State v. Squillante*, *supra*. The passion and prejudice it produced were supremely out of proportion to its probative value. Therefore, the admission of this testimony constituted a serious abuse of the trial justice's discretion. *State v. Marini*, 638 A.2d 507, 516 (R.I. 1994). In a case that rose and fell on the recipient and interpreter of these letters, their improper admission cannot be deemed harmless.

## V. THE TRIAL JUSTICE COMMITTED REVERSIBLE ERROR BY REFUSING TO GIVE AN ACCOMPLICE INSTRUCTION TO THE JURY.

**Facts**

In his summation, defense counsel argued that out of the many witnesses and almost ninety pieces of evidence that the prosecutor presented at trial, Bobbie-Jo Dumont was the only one who linked Harold Drew to the murder of Jack Andrews. TR V 1293. Not only was Bobbie-Jo an accomplice turned suspect turned state's star witness, counsel further argued, but she also was an individual whose past acts of exploitation and violence against Jack Andrews eventually culminated in his vicious murder:

> Bobbie-Jo Dumont, Bobbie-Jo Pimental, Ashley Clarke, by whatever name she goes by, make no mistake about it, this case is all about her. She is the only witness in this case that points the finger at Harold Drew, the only link in this case between Harold Drew and the crimes that he is charged with. I suggest to you, also, because she's the only person who had a motive to kill Jack Andrews, the only person who was going to lose something if Jack Andrews got out of this B&E group that they were in, the only one. She stood to lose a relationship that she had with this man for about five years, the support, rides to methadone for her to get methadone every day. She was the one that stood to lose if he decided once and for all he wasn't going to have anything to do with her. She needed that truck. Harold didn't need it. * * * She is the only person with the motive to kill Mr. Andrews, and I suggest to you that the evidence in this case points a finger at her as being the shooter.

TR V 1292-93. Based on the evidence and Mr. Drew's defense, counsel was adamant that an accomplice instruction be given to the jury to guide them in assessing Bobbie-Jo's testimony. To that end, defense counsel tendered a very comprehensive charge on the subject while also disclaiming his desire for a word-for-word instruction by the court. *See* Defendant's Requests 14-18 "As To The Testimony Of An Accomplice." The heart of the defendant's request, based on a Connecticut pattern instruction, read as follows: "[T]he law now is that the jury must look with particular care at the testimony of an accomplice and scrutinize it very carefully before they accept it." *Id.* at No.18. The defense's proposal and argument on

the issue, TR V 1240-43, was countered by the prosecutor's vehement objection, TR V 1236-39.

The trial justice then drafted his instructions in written form, showing them to the parties for comments and objections prior to their being read and delivered in-hand to the jury. In addition to the standard instruction on credibility of witnesses, the trial justice offered the following written charge on bias and prejudice as well as on promises and inducements:

> You should consider the interest or lack of interest of the witness, if any, in the outcome of the case, and the bias or prejudice of the witness, if any.
>
> You may consider whether any witness would have a motive to be truthful or untruthful in his or her testimony. The jury is entitled to consider, in weighing the testimony of a witness like Ms. Dumont who has testified with certain promises made to her by the state, whether the promises made to Ms. Dumont itself is a strong or impelling reason for a witness to lie or to fabricate or color her story.

*Instructions* at p. 8. The trial justice's oral instructions were given almost *verbatim* to the written charge. TR V 1268. While the prosecutor objected, stating that the instruction went too far and was essentially a comment on the evidence, TR V 1248-49, defense counsel argued that the instruction, though proper, did not go far enough and again requested an explicit accomplice instruction. TR V 1250-51.

**Discussion**

Mr. Drew urged the Rhode Island Supreme Court to reconsider and overturn its line of cases which reject the accomplice charge in prosecutions with accomplice-accusers, which the Court refused to do. 919 A.2d 405-06. The Rhode Island Court has consistently held not only that it is unnecessary for a trial justice to give an accomplice charge, but also that it is a better practice to avoid giving such a charge at all. *State v. Sivo*, 809 A.2d 481 (R.I.

2002); *State v. Marrapese*, 583 A.2d 537 (R.I. 1990); *State v. Mastrofine*, 551 A.2d 1174 (R.I. 1988); *State v. Fenner*, 503 A.2d 518 (R.I. 1986); *State v. DeMasi*, 413 A.2d 99 (R.I. 1980). The reason underlying the Court's rule is the fear that, in giving such an instruction, the trial justice would essentially be commenting on the evidence and thereby acting as an advocate for the defense. *E.g., State v. Fenner*, 503 A.2d at 525. "The promise of immunity," stated the Court, "does not necessarily destroy the witness's veracity." *State v. DeMasi*, 413 A.2d at 100.

While no court anywhere condones the partiality of a trial judge and his or her biased comment on the evidence, the overwhelming majority of jurisdictions across the country that have considered the issue have not only approved the accomplice instruction as discretionary, but have also *required* it in the appropriate case. As one distinguished law professor summarized:

> Accomplice testimony in a criminal trial is highly relevant and, often, essential in the prosecution of crime. . . . Given the accomplice's obvious motive to tailor his or her testimony to satisfy the prosecutor, however, such testimony is also quite often of questionable reliability. Accordingly, lawmakers have sought to safeguard against false convictions based on such testimony. Some jurisdictions require such testimony to be corroborated; some require the judge to issue a cautionary instruction to the jury about how to evaluate such testimony; and some jurisdictions require both measures. * * * The words "care" and "caution" appear perhaps most frequently, but other cautionary words such as "suspicion" also appear. Other formulations are also used.

Fishman, Clifford S. "Criminal Law: Defense Witness As 'Accomplice': Should The Trial Judge Give A 'Care and Caution' Instruction?" 96 *J. Crim. L. & Criminology*, 1 (Northwestern School of Law) (Fall, 2005) (footnotes deleted).

Indeed, most jurisdictions uphold the right of an accused to a "traditional" instruction that accomplice testimony be considered with suspicion, caution, or distrust; moreover, the

prosecutor is not allowed "to water down such instruction with an additional charge that the credibility of an accomplice is to be passed on by the jury in the same way as the credibility of any other witness." Annot., *Propriety of Specific Jury Instructions As To Credibility of Accomplices.* 4 A.L.R.3d 351 §§ [1][1a][1c] (2005) (and cases cited therein). "In most jurisdictions, the law is on the defendant's side." *Id.* at § [1c]. *Accord* 1 *Wharton's Crim. Law* § 38 at 230-241 (C.E. Torcia, ed. 15th ed. 1993) (and cases cited therein).

In the federal system, numerous courts have held that where accomplice testimony is presented, especially without corroborative evidence, a cautionary instruction is required and its omission constitutes error. Annot., *Necessity of, and Prejudicial Effect of, Omitting Cautionary Instruction to Jury as to Accomplice's Testimony Against Defendant in Federal Criminal Trial.* 17 A.L.R. Fed. 249 (2005) (and cases cited therein). For example, the First Circuit Court of Appeals has approved the following pattern instruction in cooperating witness or accomplice cases:

> You have heard the testimony of [name of witness]. He/She
>
> (1) provided evidence under agreements with the government;
> [and/or]
> (2) participated in the crime charged against [defendant];
>
> * * *
>
> Some people in this position are entirely truthful when testifying. Still, you should consider the testimony of these individuals with particular caution. They may have had reason to make up stories or exaggerate what others did because they wanted to help themselves.

"Pattern Criminal Jury Instructions For The District Courts of the First Circuit." § 2.07 at p. 31 (1997), available at http://pracdl.typepad.com/crpji.97nov.pdf. *See also* Fishman, *supra*, at n.18-21 (setting forth similar instructions from the Third, Seventh, Eighth, Ninth, and

Eleventh Circuits, as well as those from California, Colorado, Hawaii, Idaho, Illinois, Michigan, Mississippi, Nebraska, and Oklahoma).

Even where the defendant in a robbery case neither filed a written request for an accomplice instruction nor took an exception to its lack, the Connecticut Supreme Court held it was nevertheless the trial court's "*duty* to caution the jury as to the testimony of an accomplice in its charge." *State v. Brown*, 447 A.2d 734, 740 (Conn. 1982)(emphasis in original). The Court held that, "[b]ecause of [the witness'] status as a self-confessed accomplice in the crimes for which the defendant was being tried and her possible interest in favorable treatment, the evidence warranted the giving of the cautionary accomplice instruction." *Id.*[8] *Accord State v. Patterson*, 886 A.2d 777 (Conn. 2005).

If ever there was a case that cried out for an accomplice instruction, this one was it. For all the sound and fury swirling about in this case, Mr. Drew's conviction rested solely on Bobbie-Jo Dumont's more than dubious credibility. While the judge correctly instructed that the jurors should consider her interest in the outcome of the case and the promises made to Dumont, he failed to instruct on her most compelling motive for testifying falsely and inculpating Mr. Drew: to save her own sorry skin. The bottom line is that the accomplice instruction is a standard instruction given across the country when the facts of a particular case warrant it; to have failed to give it here was tremendously prejudicial to Mr. Drew and constituted reversible error.

---

[8] The Court further held, however, that the error was harmless since, in addition to the defendant's incisive cross-examination of the witness, much of the witness' testimony was corroborated by the testimony of another witness, and there was otherwise overwhelming evidence of the defendant's guilt. The latter two factors certainly were <u>not</u> present in this case.

## VI. THE TRIAL JUSTICE ERRED IN DENYING MR. DREW'S MOTION TO EXCLUDE HIS PRIOR CONVICTION FOR MANSLAUGHTER, PURSUANT TO RHODE ISLAND RULE OF EVIDENCE 609.

Prior to trial, the defense filed a motion *in limine* seeking to preclude the state from impeaching Mr. Drew with his record of prior convictions, so that he could take the stand and testify in his own behalf without suffering undue prejudice. *See generally* TR I 18-29. While defense counsel acknowledged Mr. Drew's four page BCI report and believed most of those convictions should not be utilized for impeachment purposes should Mr. Drew take the stand, TR I 18-22, the prosecutor desired to "introduce each and every one for impeachment purposes," TR I 23.

Although Justice Clifton did rule that several of Mr. Drew's prior convictions would be off-limits for impeachment purposes as overly prejudicial to the defendant, TR I 27-29, he declared that several would be available for the jury's consideration:

> Again, just to be clear the 2002 possession of a controlled substance will be allowed; the 1997 conviction for possession of heroin will be allowed; the 1989 conviction for entering a building with felonious intent will be allowed; and the 1982 conviction for manslaughter will be allowed, subject to proof by the required means by a public document. All others, the State will be prohibited from doing so.

TR I 28-29. The reason why the judge permitted certain prior convictions and not others seemed to be their *similarity* to the charged crimes:

> The 1993 conviction for simple assault, yes, it is a crime against a person similar of the lower variety than the charge in this matter, the charge of murder. (TR I 27)
>
> * * *
>
> [G]iven the theory of the prosecution in this matter, that the defendant, Mr. Drew, Miss Dumont, and the decedent, Mr. Andrews, were all engaged in a crime spree engaging in property crimes so that they could be able to support their addiction, the court will deny the defendant's motion in limine to preclude the 2002 conviction for possession of a controlled substance, will

> allow the State to introduce evidence of the 1997 conviction for possession of heroin, will permit the State to introduce the evidence of the B&E in 1990, and the conviction for manslaughter in 1982. (TR I 28)

Defense counsel then essentially agreed with the trial justice's ruling except for the 1982 manslaughter conviction:

> MR LOVOY: Judge, I certainly will live with your ruling, but – and I – I can understand when your Honor stated that if the State's theory here is that the defendant was doing these B&E's to satisfy a drug habit, I guess I can live with the – with your ruling about the possession of controlled substances, the B&E and the past heroin charge, but I don't see how the manslaughter conviction would fit into that.
>
> THE COURT: It does not, it truly does not fit into that, but the fact remains, Mr. Lovoy, that the defendant does have a prior conviction for manslaughter. The charge in this matter is a charge of homicide. The Court will permit the State to introduce that in the event Mr. Drew exercises his right to testify.

TR I 29.

Mr. Drew argued on appeal that the trial justice's rationale for permitting the manslaughter (and other similar) convictions was precisely for the purpose forbidden by the rules of evidence – to suggest propensity to commit the crimes charged, not simply to impeach his credibility as a witness. The Supreme Court agreed, but held that the probative value of the admitted evidence outweighed its prejudicial effect. 919 A.2d 409-10.

Rule 609(a) of the Rules of Evidence provides generally that a witness' credibility may be impeached by evidence of his or her conviction of a crime. Rule 609(b), however, provides that, "[e]vidence of a conviction under this rule is not admissible if the court determines that its prejudicial effect is substantially outweighed by the probative value of the conviction." Rule 403 similarly invests a trial justice with the power to exclude relevant evidence where the probative value of such evidence is substantially outweighed by the danger of unfair prejudice. Thus, "[i]t is well settled in this jurisdiction [Rhode Island] that

the trial justice has broad discretion in deciding whether or not to admit evidence of prior convictions under Rule 609" to impeach the credibility of witnesses. *State v. Robert Silvia, supra*, at 16. *Accord State v. Werner*, 831 A.2d 183 (R.I. 2003); *State v. Medina*, 747 A.2d 448, 449-50 (R.I. 2000); *State v. Rodriguez*, 731 A.2d 725, 731-32 (R.I. 1999); *State v. Martinez*, 652 A.2d 958, 960 (R.I. 1995); *State v. Simpson*, 606 A.2d 677 (R.I. 1992); *State v. Maxie*, 554 A.2d 1028, 1032 (R.I. 1989). An abuse of the trial court's discretion in determining whether the prejudicial effect of the prior conviction outweighs its probative value will furnish grounds for reversal by the Court. *State v. Rodriguez*, 731 A.2d at 731; *State v. Morel*, 676 A.2d 1347, 1357 (R.I. 1996).

Where there is a substantial similarity between the prior conviction and the crime on trial, or the method by which the two are alleged to have been committed, "a high degree of prejudice is created and a strong showing of probative value would be necessary to warrant admissibility." *State v. Harrell*, 506 A.2d 1041, 1044 (Conn. 1986); *People v. Allen*, 420 N.W.2d 499, 510 (Mich. 1988). Because similarity between the prior offense and the offense at trial weighs against admission of the prior offense, at least where a defendant has other prior offenses that can be used to impeach, the government should use the non-similar offenses and the similar offense should be excluded. *United States v. Cueto*, 506 F.Supp. 9, 14 (W.D. Okl. 1979).

The admission of Mr. Drew's twenty-year-old manslaughter conviction had no proper impeachment value over and above the other convictions, yet had an extremely high potential to cause unwarranted prejudice. This is a case where the trial justice abused his discretion in denying Mr. Drew's motion to exclude this conviction, and reversal was the appropriate remedy.

# CONCLUSION

For all of the foregoing reasons, as well as for those reasons which may later be raised, the Petitioner, Harold Drew, very respectfully prays that his petition be granted by this Honorable Court.

Respectfully submitted,

________________________________

HAROLD DREW
*Pro se*